## KING v. FRASER.

1. Whether an agreement between A and B, under which A was to receive "as compensation for his services one-half of the net profits, after paying all expenses," was such a partnership as entitled A to claim an interest in property purchased and paid for by B and conveyed to him alone, was a question of fact; and the finding by master and Circuit Judge upon this point was affirmed, it not being unsustained by the evidence.

2. Under the registry act of 1876 (16 *Stat.*, 92; *Gen. Stat.*, § 1776), a mortgage recorded after the time (40 days) allowed by that act, acquires a lien from the date of its record, and will, from that date, have prior-

ity as to the mortgaged lands over the general debts of the mortagor not having liens, including such as were contracted without notice to the creditors, between the date of the execution of the mortgage and the date of its record. MR. JUSTICE McIVER, *dissenting.*

3. Counsel being absent at the call of a cause in its regular order in this court, the court declined to fix another time for counsel to argue the appeal orally, but granted them leave to submit an argument, which was done. *Held,* the refusal to fix a further time out of order furnished no ground for a rehearing.

Before HUDSON, J., Charleston, July, 1884.

A statement of the facts of this case will be found in the opinion of this court. Upon the status of the Doar mortgage, the master reported as follows:

But it becomes necessary, in the next place, to consider what effect *the failure of the executors of Doar to record* their mortgage *within forty days* from its execution as prescribed by law, and their recording it after that time, has upon the relative rights of parties as to the fund in court. The mortgage held by the executors of Doar was executed on February 1, 1877, and was recorded on January 7, 1879. *Between those dates all the claims of the general creditors accrued.*

It has been earnestly contended, with great force and ability in argument before me, that, inasmuch as these claims were not reduced to judgment prior to the recording of their mortgage by the executors of Doar, on January 7, 1879, they had no lien at that date; and that, under the act of 1876, the mortgage previously unrecorded, but recorded at that date, became from that time a lien prior to any lien that might be acquired by judgments obtained by these creditors after that date. Or to state the question in the language of the learned counsel, who so ably argued the point before me: "The precise question is, whether, under A. A. 1876 (*Gen. Stat.,* § 1776), a deed in fee simple, or a mortgage recorded more than forty days after its execution, is valid against the claims of a creditor whose debt was *contracted* between the date of the execution and the date of the recording of such deed or mortgage, but who had no specific lien or right *in rem,* to be interfered with by the deed or mortgage at the date of its

record. In other words, who are meant by the words 'subsequent creditors and purchasers' ? Do they include *all* creditors or purchasers subsequent to the execution or delivery of the deed or mortgage, or only those whose specific liens, or rights *in rem*, are interfered with by the recording of the deed or mortage ?"

It was urged that under the act of 1876, the recording of the deed or mortgage executed more than forty days previously, was equivalent to its re-execution at that date, and was a publication and notice of such re-execution, by and from the time of such recording. And that, therefore, as a new deed or mortgage executed on that day would certainly rank as a prior lien as against any "rights" of any creditor who was not a judgment creditor at that date, so an old deed or mortgage then for the first time recorded, would operate in the same way; and that the one would work no greater hardship to the general creditor than the other. It was contended that this was the policy and purpose of the act of 1876, in providing "that the above mentioned deeds or instruments in writing, if recorded subsequent to the expiration of said period of forty days, shall be valid to affect the rights of subsequent creditors and purchasers for valuable consideration, without notice, only from the date of such record."

I have been very much impressed by this argument. I am aware of the dangers and inconveniences that must be encountered in the examination of titles, when a deed or mortgage which forms a part of the chain of title is recorded out of due time, and I understand the hardships which may be worked, if the words "subsequent creditors" shall be interpreted to mean "general creditors as well as judgment creditors." I am not opposed to some mild judicial legislation, to correct and harmonize the sometimes crude provisions of acts of assembly; but after the most careful consideration, I cannot hold this to be the true interpretation of the words, "rights of subsequent creditors," in the act of 1876. I can find no authority or precedent for so sharp and material a change in the language of the act as to make the words "creditors" read "judgment creditors." And I can find no warrant for such a change or for such an interpretation either in the context of the act, or in the history of the registration laws in this State.

The chief authority relied upon for this interpretation seems to be certain language of that learned and distinguished jurist, Judge Wardlaw, in the celebrated case of *Steele* v. *Mansell*, 6 *Rich.*, 452–455. But the only questions *decided* in *Steele* v. *Mansell* were: 1st. That a subsequent judgment, under the law as it then stood, was not preferred to an unrecorded absolute conveyance of land. 2d. That under the joint operation of the 45th section of the county court act of 1785 and the act of 1698, an absolute conveyance of land, not recorded for four years after its delivery, but recorded before any subsequent conveyance was made, had priority over a subsequent conveyance, which was recorded within six months from its date. All the rest of the opinion in that case is historical, discursive, critical, and suggestive; but it makes no judicial decision of the questions suggested. It does suggest that under the 45th section of the act of 1785, "creditors" *might* have meant only judgment creditors. And it does suggest that under the joint operation of the act of 1698 and the 45th section of the act of 1785, recording after the prescribed time *might* have been considered to have had the same effect as if the deed had been executed on the day it was recorded. But neither question was even pretended to be decided, even as an historical question. It was a suggestion of possible views of the courts in the past, and nothing more.

I think everybody will agree with the learned judge who delivered the opinion in that case, when he says that "our registry law was, before the act of 1843 concerning mortgages, lamentably *obscure* and deficient." It is apparent, too, that the court, in *Steele* v. *Mansell*, regarded the act of 1843, as far as mortgages were concerned, as a new departure in our registry law, and that it must receive independent interpretation. They suggest, and only suggest, as a difficult question what would be the effect under that act, of recording after the prescribed time, but before opposing rights had accrued.

It would be difficult, too, not to concur with the chief justice, when, in *Williams* v. *Beard* (1 *S. C.*, 321), he says: "It would be a matter more of interest and curiosity than of practical utility to consider here the numerous decisions under our registry laws." * * "The question, however, with which we have to

deal is, in our judgment, affected by neither of the said acts [the act of 1698 and the 45th section of the county court act of 1785], unless we can be persuaded by the argument to hold that the act of 1843 was intended by the legislature to compel no change, and must be construed with reference to the former acts, only adding another to the structure, which was in no way to destroy the symmetry of the whole." And in *Youngblood* v. *Keadle* (1 *Strob.*, 130), Wardlaw, J., says: "Our act of 1843, concerning the recording of mortgages, has so altered the law, that many cases are not likely to occur in which the decision now made will be exactly applicable." It is thus apparent that the act of 1843 has been on all hands recognized as a new departure in our registry law, so far as mortgages are concerned.

Still more clearly, it seems to me, is the act of 1876 (*Gen. Stat.*, § 1776) to be interpreted independently of the acts of 1698 and 1785. It is evidently a well considered effort to deal effectively and clearly with the whole subject of registration. It includes in its provisions absolute conveyances and other writings therein named, as well as mortgages. It changes the time allowed for recording. It enacts that "the deeds and instruments of writing therein named shall be valid, so as to affect, from the time of delivery or execution, the rights of subsequent creditors or purchasers for valuable consideration without notice, only when recorded within forty days from the time of such delivery and execution," &c.

But *McKnight* v. *Gordon* (13 *Rich. Eq.*, 222), and *Williams* v. *Beard* (1 *S. C.*, 309), had been decided. These in effect established that, under the act of 1843, the recording of a mortgage after the prescribed time did not operate as *constructive notice* from the date of record. And, therefore, in the act of 1876 the following proviso was added: "*Provided, nevertheless,* that the above mentioned deeds and instruments in writing, if recorded subsequent to said period of forty days, shall be valid to affect the rights of subsequent creditors and purchasers for valuable consideration without notice only from the date of such record." It will be observed, however, that the words, "shall be valid to affect the rights of subsequent creditors and purchasers for valuable

consideration, without notice," are an exact repetition of the language of the act of 1843.

Accepting, then, the acts of 1843 and 1876 as constituting a new departure in our registry law, it now becomes necessary to decide for the first time in the history of these acts what is meant by the words "subsequent creditors." Do they mean only creditors who have reduced their claims to judgment after the execution, but before the recording, of the deed or mortgage, or, in other words, only "judgment creditors;" or do they include all creditors whose debts have been *contracted* between those dates, or in other words, "general creditors" as well? The case of *McKnight* v. *Gordon* would seem to have come very near deciding it. But the question was not actually involved in that case. And the necessity, therefore, remains for an explicit decision.

It is a rule of interpretation so familiar and so long and well established that it is needless to cite authority for it, that, as a general rule, the words of statutes are to be taken and interpreted in their ordinary, popular, and customary sense, unless they are otherwise defined, either by express definition, or by the context of the same act, or the context of other acts dealing with the same subject, or, as it is said, in *pari materia*, or by judicial decision. Now, I find nothing, either in the context of the act of 1876 or that of 1843, or in any judicial interpretations of either, to warrant the giving of any other meaning to the word "creditors" than its well-established customary, commercial, and legal sense. The word "creditors" in all these senses means simply and plainly one who gives "credit" to another, by giving him money, or some other value, on the "credit" of, or the faith in, his honesty and his *ostensible means of paying ;* or, in other words, it means those who popularly, commercially, and legally are known as "general creditors"—creditors who have given "credit," but have neither originally given, nor subsequently obtained, any lien or security for the payment of their debts.

The distinction between "judgment creditors" and "general creditors" was perfectly well known to the law and thoroughly established in its language. It is recognized in the very case of *Steele* v. *Mansell*, which is relied on for a different interpreta-

tion. It occurs *passim* in all the authorities. It is one of the phrases and features of the law, better known perhaps than any other among laymen, who thoroughly appreciate the difference between the creditor who can levy upon your property for payment and the creditor who can only dun you for his debt. The legislature must be assumed not only to have well known the distinction between these two classes of creditors, but to have used the language of the acts with the purpose of providing for an existing evil or remedying some defect in the law.

What was the evil to be remedied? Ours is pre-eminently a commercial generation. The security of trade is one of the great objects of our governments. Trade is largely based upon the credit given to those who seem to have the means of paying, and who are believed to be fair and open in disclosing their property, and in declaring the incumbrances upon it. Registry laws are intended to furnish the citizens with the facilities of giving notice of their property and its incumbrances on the one hand, and of giving creditors the means of knowing what these are on the other. Such laws must necessarily be imperfect, but this is unquestionably their wise and useful purpose. The evil to be remedied was that some persons, by failing to record their deeds or mortgages, whether carelessly or purposely, induced others to give them "credit" for the means of paying their debts, when, by their own acts, they had conveyed away, or incumbered their property and concealed, or allowed others to conceal, the fact, or neglected to give notice of it. This was the evil to be remedied. But surely the creditor who gives credit, but does not pursue his debtor to judgment, is as much deceived and wronged by the concealment as the creditor who sharply demands the rigor of the law. Did the legislature mean that creditors must make haste to pursue and cripple the debtor, or the registry law would give him no protection? We all know that such never was their temper. Yet such would be the result if the judgment creditor alone is protected against unrecorded deeds and mortgages, while the general creditor is left to suffer.

I have dwelt upon this question of the popular and customary commercial and legal meaning of the word "creditors," not only because it was the first which demanded attention, but because

it is the chief and the broadest ground on which I rest my decision.

Let us next consider what was the defect in the law as it stood in 1876 under the adjudicated cases which was to be remedied. It was found that many careless persons who had failed to record their deeds and mortgages had no means of repairing the neglect and giving notice of their existence, except by express notice to every possible creditor and every probable purchaser. Such express notice, from the very nature of the case, was almost impracticable. In *Williams* v. *Beard*, it had in effect been decided that recording after the prescribed time was not such notice as the law would recognize. The careless purchaser or mortgagee was left without a remedy. The act of 1876 came to his relief, and by the proviso we have quoted, declared that such recording, after due time, should operate as constructive notice from the date of the record.

And when we have thus described the evil to be remedied by both the act of 1843 and the act of 1876, and the defect in the act of 1843, which was supplied by the act of 1876, we have, in fact, given in brief the whole history and purpose of these acts, and by the very statement in effect decided the question before us. The great object of all registry laws is to give notice— notice to purchasers, notice to incumbrancers, notice to creditors who give credit on the faith of property. The preservation of the evidence of the deeds themselves has indeed, in these careless times of ours, been found to be an important function of registration, but it is secondary and incidental, and probably formed no part of the original purpose. That notice was the ruling idea is made unquestionable by the provision that express notice should be equivalent to careful recording. The object was thus to give notice of existing deeds, not to make, or aid in making, new securities, or giving them new dates. That was the right and function of the grantor or mortgagor alone.

And just here we have the essential difference between the recording of an existing deed and the making a new one at the date of record. With the recording the grantor or mortgagor has nothing to do. He need not be consulted. He has no right, and has placed it beyond his power to prevent it. But a new

deed cannot be made without his express consent and concurring action. He might see proper, and think it right, not to make the new deed. He might sometimes justly say, "I supposed your deed was recorded ; I have contracted debts, believing that my creditors knew from the records that my property was incumbered by your mortgages; I find that they have given credit on the faith of those records, which gave no notice of any incumbrance ; they must not suffer by your *laches ;* you must take the consequences of your own neglect; I decline to execute the new deed." Would the law, does the law, can the law compel him ?

Again, both under the act of 1843 and the act of 1876, express notice, whether to purchasers or creditors, was to be a full equivalent for and have all the effect of recording. Could mere notice of an old deed, however clear, full, and express, have made that old deed a new deed, or have given it all the effect of a new deed ? Can express notice be not only notice, but re-execution also? Can constructive notice be anything more ? Could such notice of an unrecorded mortgage to creditors, after their debts were contracted, but before they had obtained judgments, have had the effect of defeating their rights as creditors under the act of 1843, which provided for the case of express notice, but not for the case of recording after due time ? Can express notice have such an effect in a similar case under the act of 1876 ? What is there in the act of 1876 which gives express notice a greater effect under that act than express notice under the act of 1843 ? Can the constructive notice of recording under the act of 1876 have a greater effect than its equivalent express notice under that act? I think the whole theory, policy, and purpose of our registration law contradicts such an idea. Under the act of 1876, it seems to me, notice, whether express or constructive, remains notice, and nothing more.

In *McKnight* v. *Gordon* (13 *Rich. Eq.,* 231), Chan. Inglis says : "Recording is not an element in the due execution of a mortgage." And again, after stating the mischief to be remedied, he says: "The remedy provided (by registration laws), therefore, consists in giving notice, so far as the law can effect this, to all persons, of every such mortgage sale, &c., by requiring of the first purchaser, &c., under pain of the defeat or post-

ponement of his estate, that the deed or other instrument by which his purchase has been consummated, or an abstract of it, shall be recorded within a reasonable time in public books, kept in a public office provided for the purpose, to which office or books all persons may have free access." And on same page: "The courts have uniformly in their construction of these laws come to hold that registration, being but a substitute for actual notice and intended to secure this, is not essential when the party intended to be protected has such notice." And in the same case the same distinguished chancellor says: "But the positive rule of law established by this statute precludes the mortgagee who has omitted to put his mortgage upon record within the time limited, from interposing the estate which he acquired by it in bar or derogation of the estate or claim for which one who is within the terms of its protection has paid."

Taking these extracts from the opinion of Justice Inglis together, they not only sustain the position that recording is notice, and only notice of a deed, and not a re-execution of that deed, but in the use of the word "claim," as among the rights to be protected, he came as near deciding the question as he well could in a case in which the question was not involved. This was, it is true, under the act of 1843, but as we have before said, the language of that act in regard to "subsequent creditors" is identical with the language of the act of 1876.

But in reply to all this, it was earnestly urged in argument before me that the act of 1876 made a mortgage recorded after the prescribed time "valid to affect the rights of subsequent creditors and purchasers for valuable consideration, without notice, from the date of such record." And that if creditors had no judgments before such recording, they could have no "rights" *in rem* until after the recording, and the mortgage would be valid against these debts only contracted, but not reduced to judgment before such recording. And to illustrate the absence of such rights *in rem*, it is said that if either the recorded or the unrecorded mortgage was foreclosed, such creditors would not be necessary parties to the action as having no lien. But it must be remembered that the act does not say "rights *in rem*," but simply "rights." Have creditors no "rights" under the law, but "rights *in rem in pre-*

*senti"* ?   May they not have rights which may become rights *in rem in futuro* by appropriate proceedings—rights *in rem* which, when acquired, will relate back to, and be protected by, their "rights" as creditors, existing before the mortgage was recorded, and which will rank and take priority as of that date ?   In other words, may they not have "rights" in the nature of *equities* which the law will respect and enforce as effectually as they would respect and enforce a "right *in rem*" ?

Similar equities are well known to the law and thoroughly established.   The equity or *quasi* lien of creditors of the estate of a decedent will furnish an example.   See *Jones* v. *Wightman*, 2 *Hill*, 580; and *Adger & Co.* v. *Pringle*, 11 *S. C.*, 527.   The equity of creditors (general creditors as well as judgment creditors) against a voluntary conveyance is an equity so well known as to be familiar law, and needs only to be referred to.   In the case of these voluntary conveyances the voluntary grantor need not be shown to have had judgments against him unsatisfied at the date of the voluntary conveyance.   (The lien of such judgments would protect themselves without the aid of the equity.) It is sufficient to show that those claiming the equity were *bona fide* creditors at the date of the voluntary conveyance.   Could a substantial equity of "general creditors" be more clearly recognized ?   The claim of general creditors against an unrecorded marriage settlement will furnish another example.

And so in the case of general creditors subsequent to the execution of the mortgage, and before it was recorded.   They may not be necessary parties to an action for foreclosure, but they are necessary parties *to the title*, so to speak.   They cannot maintain a creditor's bill until they have obtained judgment.   But when they have obtained judgment their equity will relate back to the time of contracting the debt, and the purchaser at the sale under the foreclosure will take subject to an equity of the possibility of which he was notified by the fact that the mortgage was recorded out of due time.   In *McKnight* v. *Gordon*, already recited, Judge Inglis, at page 243, says: "Let it be borne in mind, then, that there are two classes of persons protected against the damage to be apprehended from these undisclosed mortgages :   1. Subsequent creditors of the mortgagor without notice of the mortgage.

2. Purchasers for valuable consideration without such notice. In order to make the rule effectual for the defence of the former class, it is necessary to insure a good title to purchasers at sales under their executions, whether such purchasers have or have not notice."

I understand very well that the exact question in this case was not involved in that case. I have only quoted the passage to show that the judge in that case had in his mind equities, which might only be equities when the "rights" accrued, but might become effective "rights *in rem*" against a mortgagee or a purchaser under the foreclosure of his mortgage. And it is noteworthy that neither in that case, nor in *Williams* v. *Beard*, already cited, is there any suggestion even that by "subsequent creditors" only judgment creditors might be intended.

One further consideration deserves brief notice. It would seem that if only creditors having judgments prior to the date of recording can claim under the act of 1876 against a mortgage recorded out of due time, because the recording was equivalent to the re-execution and delivery of the mortgage at that date, then the provision of the act of 1876 for the protection of subsequent creditors was wholly superfluous. The lien of their judgments would have protected them, without the protection of the statute. *Ex proprio vigore* they would be liens prior to any deed or mortgage re-executed as of the date of record.

There may be inconvenience, hardships, and embarrassments growing out of what I hold to be the true construction of the act of 1876. But it must be remembered that one object of the act was to compel persons to record their conveyances and mortgages under pains and penalties. Frauds may be practised perhaps under that construction. But, as is well known, hardships and embarrassments and frauds may occur under the act of 1876 (and perhaps under any registration act) even as to those parts of it about which there never has been, nor ever can be, any dispute. And perhaps some of the questions of hardship and difficulty suggested in argument may receive solution, without so strong an act of judicial legislation as changing the well considered language of a statute.

After this anxious and careful consideration of the whole sub-

ject, I hold that the words subsequent creditors in the act of 1876 includes general creditors, and cannot be confined to judgment creditors.

And I hold, therefore, that the mortgage of "Jack's Bluff and Elmwood," proved in this case by the executors of S. D. Doar, is not a prior lien as against the claims of creditors for debts contracted by the defendant, S. S. Fraser, subsequently to the date of the execution of that mortgage, and prior to its being recorded, *except* in so far as that mortgage may be protected by the subsequent and duly recorded mortgage of the same tracts of land to the defendant, R. E. Fraser, who had express notice of this mortgage to the executors of Doar.

And this leads to one other question which remains to be considered. The mortgage of Jack's Bluff and Elmwood, proved in this case by the executors of Doar, was not recorded until all the debts of the claiming creditors had been contracted. The mortgage of the same tracts of land to the defendant, R. E. Fraser, was duly recorded within forty days from the date of its execution. But R. E. Fraser had express and admitted notice of the Doar mortgage at the time of the execution and record of his mortgage.

These conflicting claims present a curious puzzle, and the proceeds of sale of the land in dispute would at first sight seem to move in the endless circle of passing from the hand of one claimant to another claimant, and from the second claimant to a third claimant, and from the last to the first again, who must again pass it on through the same circle indefinitely. For example, the creditors of the mortgagee cannot claim against the mortgage of R. E. Fraser, because as to them it was duly recorded, and is a prior lien. But Fraser cannot hold so much of the proceeds of sale as is covered by the Doar mortgage, because he had express notice of it. And it is claimed that the executors of Doar cannot hold their portion of the proceeds against the creditors, because, as to them, their mortgage was not recorded, and *they* had no express notice of it.

But I think the circle can be broken and the problem equitably solved, by holding each party to his or their contract, and giving

the executors of Doar the benefit of their diligence in giving notice to Fraser.

1. It is evident that the creditors cannot equitably claim more than the balance of the proceeds of sale remaining after payment in full of Fraser's mortgage, because it is duly recorded, and they so had notice of it, and must be assumed to have given credit, subject to the right of the mortgagor to make it. This balance, then, is the only part of the proceeds of sale which can possibly come to the creditors.

2. R. E. Fraser can only claim, under his mortgage, the balance of the proceeds of sale remaining after deducting the amount due on the Doar mortgage, because he had notice of that mortgage, and this balance was the security for which *he* contracted. This balance, then, is the only part of the proceeds of sale which can come to R. E. Fraser.

·3. But the executors of Doar did not give notice to Fraser for the benefit of the creditors of the mortgagor. They gave that notice for their own benefit. So much, then, as R. E. Fraser (and not the creditors), by reason of the notice of the executors of Doar to him, contributes to the payment of their mortgage they are entitled to retain; but so much as the creditors could claim after R. E. Fraser is paid in full (as before stated) the executors of Doar must pay over to them. Because, as to this last amount, the executors of Doar, by failing to record their mortgage in time, are held in law to have contracted that the creditors should have it. Or, in other words, what the executors of Doar can retain under their mortgage is the *difference* between the *full amount* Fraser could have claimed if they had not given him notice of their mortgage, and the *reduced amount* he is compelled to take by reason of that notice. Or, in other words again, just so far as, in the division of the proceeds, the Fraser mortgage laps over the Doar mortgage, just so far it protects that mortgage, and no farther.

I hold, then, that the proceeds of sale of the "Jack's Bluff and Elmwood tracts" are to be practically distributed as follows: 1. R. E. Fraser is to be paid out of the proceeds of sale the amount due on his mortgage, less the amount due on the Doar mortgage. 2. The creditors are to be paid the balance, if any, of the pro-

ceeds of sale which *would* remain if the Fraser mortgage were paid *in full.* 3. The executors of Doar are to be paid the difference between what the creditors receive, if any, and the whole amount due on their mortgage. This method of solving the problem stated and of adjusting the conflicting claims is, it seems to me, what is practically meant by the doctrine laid down in the cases of *Earl of Pomfret* v. *Lord Windsor,* 2 *Vesey,* 472, 486; and in *Wilcocks* v. *Waln,* 10 *Serg. & R.,* 380; and in *Manufacturer's and Mechanic's Bank* v. *Bank of Pennsylvania,* 7 *Watts & S.,* 335, cited in 2 *Lead. Cas. Eq.,* 185.

It has been contended before me that the meaning of the doctrine in these cases is, that the Doar mortgage is to be paid, *not out of the entire proceeds of sale,* in such shares to Doar and the creditors, respectively, as I have above held they are to receive, but the entire amount due on the Doar mortgage is to be paid by Fraser out of *that portion of the proceeds of sales* which would have been his, if he had not had notice of that mortgage, and that the *entire amount* so paid is to be retained by the executors of Doar, while the creditors still receive the balance coming to them, after deducting the full amount due on the Fraser mortgage. Not only do I not believe this to be the true doctrine of those cases, but even if it was, I would regard such a ruling, which would thus punish Fraser for the failure of the executors of Doar to record their mortgage, as so repugnant to reason, justice, and equity that I would not feel bound by the authorities cited, but would still report as I have done and await the decision of our own courts.

In applying, however, the rule of apportionment I have adopted in the distribution of the proceeds of sale of Jack's Bluff and Elmwood, an equity arises which seriously affects the portion coming to the creditors. It is a familiar principle in marshalling assets, that where one of two creditors holds two securities for the payment of the same debt, and another creditor holds a subsequent lien or claim on the property included in only one of these securities, the creditor so holding the double security will be required to first exhaust the security in which the other creditor has no interest, before seeking payment out of the property on which alone that other creditor must rely for the payment of

his claim. For the "advances" proved by the defendant, R. E. Fraser, in this case, he holds a double security, namely, the mortgage of Jack's Bluff and Elmwood, and the bill of sale of the turpentine, naval stores, and rice on those places at its date.

In ascertaining, therefore, the amount due on the claim of R. E. Fraser, which is to be paid out of the proceeds of sale of Jack's Bluff and Elmwood, he must be required to first exhaust the turpentine, naval stores, and rice for the payment of his "advances," and can only claim the balance of "advances" then left unpaid, and the amount due on the promissory note, under his mortgage of Jack's Bluff and Elmwood. And, therefore, the extent to which his recorded mortgage will protect the unrecorded mortgage of the executors of Doar is to be fixed, not by the whole amount due on his claim, but by the balance remaining due after this equity of the creditors has been enforced. In other words, Fraser's mortgage cannot protect the Doar mortgage beyond the amount Fraser can equitably, as well as apparently, claim under that mortgage as against the creditors. And, as we have seen, the only amount he can equitably claim under his mortgage, as against the creditors, is the balance left after exhausting the turpentine, naval stores, and rice in payment.

The decree of the Circuit Judge was a simple order confirming this report.

*Mr. T. M. Mordecai,* for plaintiff and the general creditors.

*Messrs. J. P. Lesesne* and *Isaac Hayne,* for the executors of Doar.

*Messrs. Rutledge & Young* and *J. W. Perry,* for respondents.

November 27, 1885. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. The pleadings and earlier proceedings are not in the "Case," but from the very full report of master Hanckel, it appears that prior to 1876 there had been a partnership between the plaintiff, S. B. King, and the defendant, S. S. Fraser, under the style of "S. B. King & Co.," in carrying on

the business of a turpentine farm and store called "Six Mile store," in Georgetown County; that this copartnership was not successful, and in 1876 was dissolved, its available assets realized, and all the debts paid, mostly by S. S. Fraser, to whom the other partner, S. B. King, was largely indebted.

Under these circumstances a new arrangement was made by the parties, which, as the master reports, was substantially as follows: "It was agreed that S. S. Fraser should purchase in his own name and with his own funds two tracts of land in the County of Charleston (now Berkeley), known as 'Jack's Bluff' and 'Elmwood,' for the purpose of carrying on the business of a turpentine farm, and that in some sort of connection therewith (not very clearly shown by the evidence) he should establish at South Santee Ferry a general store called 'Romney,' the entire business of both places to be carried on in the name of S. S. Fraser, and one to be designated as 'Elmwood,' and the other as 'Romney.' * * * The plaintiff, King, was to have immediate charge of the active operations of the farm and store, while Fraser was to direct and control these operations and to have the entire management of the finances; and that, for his services, King was to receive as compensation one-half of the net profits after paying all expenses," &c.

In putting on foot this new arrangement, S. S. Fraser purchased "Jack's Bluff" and "Elmwood" from the executors of Doar, took titles in his own name, and had them regularly recorded February 1, 1877 ; and at the same time he executed a mortgage of the premises to secure the credit portion of the purchase money ; but the executors of Doar neglected to record this mortgage until January 7, 1879. The business was not a success, and after the date of the aforesaid mortgage to the executors of Doar, other debts were contracted, which need not be specifically mentioned, except the following : *First.* To R. E. Fraser, part by promissory note for $1,297.46, secured by mortgage of Jack's Bluff and Elmwood, and also by an account for advances, $610.11, which was secured by a bill of sale of certain naval stores, and also covered by the aforesaid mortgage. The aggregate amount of this debt was about $1,917.57, secured by the mortgage aforesaid December 17, 1878, which was regu-

larly recorded within the time prescribed by law. *Second.* To Thomas R. Sessions, for $761.22, secured by mortgage of "one still and fixtures, two mules, one horse, and two wagons," &c., on the place of S. S. Fraser, on Wambaw Creek, &c. This mortgage was executed December 10, 1878, and it seems was regularly recorded. *Third.* General unsecured creditors of S. S. Fraser. All these debts were contracted after the mortgage was executed to the executors of Doar, and without notice of it, except that of R. E. Fraser, which was contracted after the execution of said mortgage, but it was admitted that at the time he took his mortgage he had actual notice of the then unrecorded mortgage to the executors of Doar.

R. E. Fraser, by virtue of his bill of sale of naval stores, and T. R. Sessions, under his mortgage, commenced actions for the claim and delivery of the property covered by them respectively, as the property of their debtor, S. S. Fraser. To this S. B. King, who was in possession, objected, and claiming that he was a copartner in the business, and entitled to an interest in the property, instituted these proceedings for an account, injunction, &c. The moving creditors were enjoined, and all being called in, the master made a full and exhaustive report, finding as follows : *First.* That the plaintiff, King, was not the partner of S. S. Fraser in the legal commercial sense of the word, either in the business of the turpentine farm at "Elmwood," or that of the store at "Romney ;" that all the real and personal property employed in the business belonged to S. S. Fraser, and he alone had the right to encumber it. *Second.* That the mortgage and bill of sale of R. E. Fraser, and the mortgage of Sessions, are all good securities for valuable consideration, and must rank as liens, except as they may be affected by the failure of the executors of Doar to record their mortgage within the time prescribed by law ; and upon that subject he held that the Doar mortgage, which was not recorded within time, was not a valid lien as against creditors of the mortgagor, whose debts were contracted between the date and the registry thereof, except that of R. E. Fraser, who had actual notice of the execution and existence thereof ; and, finally, that in this peculiar state of facts, the proceeds of the sale of the said premises should be distributed as follows:    1. R. E. Fraser,

after exhausting the personal property covered by his bill of sale, to be paid the amount due on his mortgage, less the amount due on the Doar mortgage. 2. The general creditors to be paid the balance, if any, which would remain if the Fraser mortgage were paid in full; and, 3. The executors of Doar to be paid the difference between what the creditors receive, if any, and the whole amount of their mortgage, &c.

To this report exceptions were filed, and the cause coming on to be heard by Judge Hudson, he overruled the exceptions and confirmed the report. From this decree the plaintiff, King, appeals: I. Because the court should have decided that there was a partnership between S. B. King and S. S. Fraser subsequently to December 31, 1876. II. Because the court should have decided that the mortgages of S. S. Fraser to R. E. Fraser and to T. R. Sessions were respectively illegal and void so far as the creditors and the plaintiff are concerned. III. Because the court should had decided that the bill of sale from S. S. Fraser to R. E. Fraser, not having been recorded, and not being a mortgage, was invalid as against the creditors and the plaintiff. IV. Because the court should have decided that R. E. Fraser must first exhaust the proceeds of the personalty covered by the bill of sale, and that out of the proceeds of the sale of the lands he was only entitled to receive the balance so remaining unpaid, and that Fraser having admitted notice of the mortgage to the executors of Doar, such mortgage being void as against subsequent creditors to the extent of the amount due on such mortgage, the general subsequent creditors are entitled to the proceeds of the sale of the lands, and that the executors of Doar are simply general unsecured creditors.

The executors of Doar appeal: I. Because the presiding judge erred in holding that because the mortgage from S. S. Fraser to the executors of Doar was not recorded until after the expiration of forty days from the date of its execution, it is not a valid lien as against creditors of the mortgagor, whose debts were contracted between the date of its delivery and that of its record. II. Because his honor should have held that when the mortgage was recorded the mortgagees acquired a valid lien upon the mortgaged premises as of the date of its record; and in the distribu-

36

tion of the sale of said premises, said mortgagees are entitled to rank as lien creditors, as of the date of the record of the mortgage, against all the creditors, alike those contracted prior to the execution of the mortgage, and those contracted between the date of the mortgage and that of its registry, and also those contracted subsequent to the record.

Whether there was such a partnership between the plaintiff, King, and S. S. Fraser, as gave to King an interest in property purchased and paid for by Fraser and conveyed to him alone, was a question of fact as to which both the master and the Circuit Judge found that no such partnership existed. Under these circumstances this court will not disturb the finding, unless it is manifestly against the weight of the evidence. We have looked carefully through all the evidence in the case, which, it is admitted, is somewhat conflicting, but, taking it as a whole, we are unable to say that the finding is unsustained. The exceptions making this point are overruled.

This brings us to the most important question in the case, *viz.*, whether the omission on the part of the executors of Doar to put their mortgage on record within forty days after its execution, although recorded afterwards and before the commencement of this suit, made it absolutely invalid as to all debts of the mortgagor contracted between its execution and registry; that is to say, whether a mortgage recorded after the time prescribed by law has a lien, as of that date, with the ordinary incidents of a lien as to all debts which at that time are unsecured or shorn of these incidents, as to that class of debts which were contracted between the execution and delivery thereof. This is a new question in this State, the precise point, so far as we know, never having arisen before; and it is certainly one not free from difficulty, arising principally from the terms of the general registration act of 1876, which it is now necessary to consider.

It has been truly said that there is no subject upon which our law has been more confused and obscure than that of registry, both as to the effect of omission to record, and of recording within as well as after the time prescribed by law. The act of 1843 (11 *Stat.*, 256) embraced only mortgages, and as to them it made no provision for recording after the time prescribed, but

left unqualified the general provision "that no mortgage of real estate shall be valid so as to affect the rights of subsequent creditors or purchasers, &c., unless the same shall be recorded in the office of the register of mesne conveyances," &c. As this act did not touch absolute conveyances, the confusion as to them still continued until 1847, when the old Court of Errors, after repeated argument in the case of *Steele* v. *Mansell* (6 *Rich.*, 438), decided that an absolute conveyance of land never recorded was not thereby absolutely void, but as between the parties was still good; that if recorded within time the deed took effect from its date, and that if recorded after the time it did not have reference back to the date of the deed, but took effect and was notice to all the world from the date of its actual registry.

Thus the rule as to the effect of registry was not the same as to mortgages and absolute conveyances, and this discrepancy continued down to 1876, when the legislature (probably with the view of harmonizing this difference, and establishing one uniform system upon the subject) passed the general registration act (16 *Stat.*, 92, re-enacted as section 1776 of the General Statutes), which repealed all former laws "inconsistent with it," and dealing with the registry of both mortgages and absolute conveyances, made as to both precisely the same regulations, which, as might have been expected, were the compound result of adding to the mortgage act (1843) the principles which had been declared in *Steele* v. *Mansell* as to the legality and effect of recording a deed after the time prescribed by law.

Possibly from this cause has arisen the obscurity of the act which, so far as relates to the point in question, is as follows: "And generally all instruments in writing now required by law to be recorded in the office of register of mesne conveyance, or in the office of the secretary of the State, delivered or executed after the first day of January, 1877, shall be valid so as to affect, from the time of such delivery or execution, the rights of subsequent creditors or purchasers for valuable consideration without notice, only when recorded within forty days from the time of such delivery or execution in the office of the register of mesne conveyance of the county where the property affected thereby is situated, &c. *Provided*, nevertheless, that the above mentioned deeds or instruments in

writing, if recorded subsequent to the expiration of said period of forty days, shall be valid to affect the rights of subsequent creditors and purchasers for valuable consideration without notice, only from the date of such record," &c.

If this section were to be considered without reference to the proviso, there would be little difficulty. Ignoring the proviso, it is clear that the body of the section declares that, without recording, none of the instruments referred to would be valid as to any debts "without notice," whether contracted before or after the date of the instrument in question; but it goes on to provide that if recorded within the time prescribed, said instrument shall be valid even as to all "subsequent creditors without notice," reaching back to the time of the delivery of the instrument. Without the proviso the section would be substantially the same as the act of 1843 in reference to mortgages, which was several times before this court, notably in the case of *Williams* v. *Beard,* 1 *S. C.,* 309, and *McKnight* v. *Gordon,* 13 *Rich. Eq.,* 223, which are not, however, applicable to the general act now under consideration; and see *Herring & Co.* v. *Cannon,* 21 *S. C.,* 212, as to an entire failure to record.

But the addition of the proviso in the act of 1876 makes a very material change in the law, applying to the registry of mortgages substantially the same rules which were declared as to the registry of absolute conveyances in the case of *Steele* v. *Mansell, supra;* and the question now presented is as to the effect of a mortgage recorded out of time upon the general unsecured debts contracted by the mortgagor between the time of the execution and registry of the mortgage. This makes it necessary to construe the proviso, the important words of which are: "shall be valid to affect the rights of subsequent creditors and purchasers for valuable consideration without notice, only from the date of such record," &c. There cannot be the least doubt that this provision was intended to give to a mortgage, though recorded out of time, some "effect" upon the class of creditors indicated; not, however, to reach back to the date of the mortgage, as in the case of one recorded within time, but only from the time of recording.

It is obvious that this postponement of the lien must seriously

affect the rights of the mortgagee, especially in respect to liens, which, in the mean time, may have been acquired by others. While the lien of a mortgage not recorded in time is in abeyance for the lack of registry, other creditors of the mortgagor may come in and acquire liens upon his property, which will take precedence over the mortgage without regard to its date. This is not expressly declared, but results necessarily from the postponement of the lien of the mortgage and the general nature of liens as to which time is the essential thing. So far, therefore, as there may be conflict between liens, there is no obscurity, for as to them it is only necessary to inquire which is the first in the order of time. We may also say in passing that if the property is actually purchased before the mortgage is recorded, and without actual notice, the innocent purchaser will undoubtedly take it unaffected by the dormant lien of the unrecorded mortgage.

So far, then, there is no difficulty, but the matter is not so plain as to what is the effect of a mortgage recorded after the time upon general debts contracted after its execution without notice, and which are found in the condition of unsecured debts at the time the mortgage is recorded and its lien attaches. It is certainly the general rule that a *bona fide* lien, no matter when entered, from that time forth has priority over all debts which are then unsecured, without the least regard to their date. This is involved in the very nature of a lien as against general unsecured debts. For example, we suppose that as soon as the Doar mortgage was recorded, the lien then taking effect, at once gave it priority even over debts (if any) contracted before the mortgage was executed.

It is, however, earnestly contended that the terms of the proviso make an exception in favor of such debts as were contracted between the execution and registry of the mortgage, for the reason that during that time the mortgage not being recorded, they were without notice ; and, further, that this immunity, this shield from the lien of the mortgage, still remains over and protects this class of creditors from the mortgage, even after it is recorded and has become an effective lien as to all other persons, and for all other purposes. This view seems to proceed upon the ground

that the exemption from the lien of the mortgage having existed during the time it was not recorded, may be said to have then attached as a charge, incumbrance, or a lien, which continues even after the mortgage is recorded, and acquires a lien, of which they have notice; in other words, that their exemption arising from want of notice continues even after they have notice.

For several reasons we hesitate to accept this view. In order to reach a satisfactory conclusion on the point, it is necessary first to settle clearly who are the persons meant by "subsequent creditors and purchasers without notice." The exact phrase occurs twice in the section, once in the body, and once in the proviso. Where it occurs in the first connection, it is plain that the creditors meant to be described are those whose debts were contracted between the execution and registry of the mortgage, "subsequent" having reference to the execution; and we see no reason to suppose that the very same phrase, when used in the proviso, has reference to a different class of creditors, and is limited to those whose debts were contracted "subsequent" to the recording instead of the execution of the mortgage. Besides those becoming creditors after the recording could not, with any propriety, be referred to as "without notice."

This being clearly settled, it would seem that the terms of the proviso itself negative the idea that a mortgage registered out of time is absolutely null and void as to all debts contracted between the execution and registry thereof, for it declares in express terms that such mortgage so registered "shall be valid to affect the rights of subsequent creditors," &c. It seems to us that there never could have been a doubt upon the subject, but for the last clause in the proviso, which makes the ambiguous declaration that such effect shall be "only from the date of such record," which, it is contended, limits the lien of the mortgage after registry to future debts, leaving the rights of the class of prior creditors before described entirely unaffected as they existed before registry.

There are insuperable difficulties in the way of this being taken to be the true construction. In the first place it would be inconsistent with the very sentence in which the phrase occurs, for that expressly declares that such mortgage so registered

"shall be valid to affect the rights of subsequent creditors without notice," &c.; and, as we have seen, all these being prior to the recording, it is plain that the vitality given to the mortgage by registry was not intended to be limited to future debts counting forward "from the date of the record." Besides, it is not denied that the lien of the mortgage thus recorded is valid as to all debts contracted before the execution of the instrument, and therefore not falling within the category of those styled "subsequent."

It is not perfectly clear, but we suppose that upon this point some confusion may have arisen from interpreting the word "from" in a sense which was really not intended. Considering the subject matter and the context, we cannot doubt that the phrase "from the date of such record" was intended, not to fix that as the point from which the lien of the mortgage was to operate forwards, but simply to indicate the time at which it received vitality; or, in other words, that the registry fixed the time at which the mortgage becomes a lien, but not the date of the debts which, as such, it might affect, according to the condition, as to being secured or unsecured, in which they were found at that time. Unless some effect upon this class of creditors was intended, why was the phrase inserted at all? The sense would have been more clear by omitting it entirely, leaving the provision as if it read, "shall not be valid to affect subsequent creditors, whose debts were contracted without notice."

If, then, the registry from its date gave the mortgage vitality to affect, in some way, the class of creditors indicated, as well as others, what was intended by the words, "valid to affect their rights," &c.? To say that a mortgage shall be valid, means, of course, valid as a mortgage, that is to say, a lien upon specific property, with the ordinary incidents of such lien, one of which is priority as to that particular property over all other debts of the mortgagor, which have not prior to that time ripened into a lien. "To affect their rights." What rights and how? All creditors in common have certain rights, as the right to be paid, to sue to judgment, and to pursue the debtor in all the various modes allowed by law. But there are certain other rights which some possess and others do not; some have liens, and some have

none, and some may and some may not protect themselves by-
the equitable defence of being "subsequent creditors" without
notice, &c.   The whole tenor of the registry act shows that the
"rights" therein spoken of, were those peculiar rights which
appertained to the class indicated as subsequent creditors without
notice of the mortgage; that is to say, the shield which protected
them from the lien of the mortgage while it lay unrecorded and
unknown.   .This was the only "right" in question or which could
be "affected" by recording.

   We can conceive of no effect of recording other than the put-
ting an end to the exemption which arose from want of notice,.
and continued until notice was given by that recording, that the
registry giving them notice at the same moment  gives vitality to
the mortgage as a lien with priority, as if the old mortgage had
never existed and a new  one had been executed and recorded on
that day, the exemption arising from want of notice ceasing to
exist as soon as notice is given.   *Cessante ratione legis, cessat
ipsa lex.*   That this is what was meant by the phrase, "shall be
valid to affect the rights of subsequent creditors," &c., conclu-
sively appears by reference to the body of the section, where, in
providing for the case of a mortgage recorded within time, the
identical phrase is used to give priority to the mortgage over
creditors whose debts were contracted subsequent to the execu-
tion of the instrument and without notice of it.

   It seems clear to us that the principal object of the registry
act was to require notice, and that it proceeds on the theory that
recording is notice, whether made in or out of time.   As fore-
shadowed by Judge Wardlaw in *Steele* v. *Mansell:* "Being with-
out registration good as to the party who made it, the deed might,
as to all other persons, be considered as if it had been executed
on the day it was registered; in other words, as if it had been
executed or acknowledged on that. day.   By delaying beyond a
prescribed time, the grantee in a deed (or a mortgage) has lost
the right to insist that the tardy registration shall have relation
to the date of the deed so as to provide against intervening claims;
but why should he lose the benefit of registration from the day it
was made?"

   It is, however, urged against this construction, that it must

operate as a hardship to the creditor who trusts the mortgagor without knowing that there was in existence a mortgage not recorded. We have considered and reconsidered this suggestion, and we confess we are unable to see the alleged hardship, beyond that which every creditor encounters when he trusts another upon faith in his ability to pay and his honesty and fair dealing. It is very true that our law properly denounces all manner of secret liens, that is, liens having an existence on property, without its being known; but this can hardly be said to extend to the case of a mere possibility of becoming a lien. Every debtor has the right to give a *bona fide* preference to one creditor over others, and this right is beyond the control of those others, who must be presumed to be aware of it and to extend credit subject to that risk. There is no obligation on the part of the creditor to whom a mortgage may be given, to record his debt, and as to the mortgage, he may omit to record or record it out of time, suffering therefor only the penalties imposed by the law. An unrecorded mortgage is in no sense a secret lien, nor, indeed, any lien at all until it is recorded. Up to that time it is precisely as if it had no existence, invalid and unknown to the creditor. It is difficult to understand how it could mislead or operate as a fraud upon him. It is true that as soon as the mortgage is recorded it becomes a lien, not, however, reaching back over the period in which the debts were contracted, but only from the date of record; the very act which makes it a lien also gives notice to the world. So far as other creditors are concerned, it would seem to be the same in effect as the giving a new mortgage or changing the date of the old one on that day.

Nor can we concur in the view suggested, that the object of registration is for the protection of the mortgagor, in order, as claimed, to secure him from the temptation of dealing with property as unencumbered which he has himself encumbered. The creditor may be ignorant of the existence of the unrecorded mortgage, and on that account he is protected until it is recorded, giving him notice; but the mortgagor certainly has knowledge of it in its inchoate state; and while the omission of the mortgagee to record may be his fault or misfortune, that surely can afford no excuse for the mortgagor to disregard what he knows to be the condition

of the property as to encumbrances. As we understand it, the object of the registration act was to give notice to the public, especially to creditors and purchasers, and not for the benefit of the mortgagor, who is bound by all the mortgages executed by him, whether they are recorded or not.

It must not be overlooked that the act of 1843 is no longer the law in relation to the recording of mortgages, but has been absorbed and superseded by that of 1876, which makes precisely the same provisions as to the registry of "all instruments in writing now required by law to be recorded," including mortgages and absolute conveyances; and, as to all, legalizes recording out of time, on the simple condition that the paper so recorded shall be valid only from the date of such record. This is a great advance as to systematizing our perplexed registry law, and in order to sustain and promote this effort at symmetry, it seems to us that it is incumbent on this court to make its decisions in regard to the registry of different kinds of instruments in the same spirit of consistency and uniformity.

The act of 1876 has not been before this court for construction, except in the single case of *McNamee & Co.* v. *Huckabee*, 20 *S. C.*, 190. That case was in reference to the registry of absolute conveyances, and involved the question as to the effect of the registry of two deeds of the same land, each of which was recorded out of time, and it was held that deeds, under the registry act of 1876, not recorded within forty days, are valid as against subsequent creditors and purchasers without notice, only from the date of record; execution of the second deed before the registry of the first, and recording out of time, being equivalent to execution after the first and recording within time, as in *Steele* v. *Mansell, supra.*

In *Piester* v. *Piester* (22 *S. C.*, 139), this court held that the mortgage in that case, recorded out of time, was void as to creditors whose debts were contracted after the execution and before its registry. But that case was not decided under the act of 1876. The question arose in the settlement of the estate of David B. Piester, who died in 1869, and, of course, both the mortgage and the debt of Wright, the "subsequent creditor," were executed before the passage of the act of 1876, and neces-

sarily fell under the operation of the act of 1843. The case was decided right under the provisions of that act, which, as has been stated, did not recognize in any way the legality of registry out of time. It was, so far as the subsequent creditor, Wright, was concerned, precisely the same as if the mortgage to the probate judge had never been recorded at all. The court say: "It cannot be necessary to do more than to refer to the express terms of the act of 1843, which declares mortgages invalid as against subsequent creditors for valuable consideration, unless the same shall be recorded in the office of the register of mesne conveyance within sixty days from the execution thereof, which was not done," &c.

The case of *Cameron, Hull & Co.* v. *Marvin* (26 *Kans.*, 622), cited at the bar, involved, as we think, a point very analogous to that under consideration. The law of Kansas required that every conveyance intended to operate as a mortgage of personal property not actually delivered, "shall be absolutely void as against the creditors of the mortgagor and as against subsequent purchasers and mortgagees in good faith, unless the mortgage or a true copy shall be forthwith deposited in the office of the register of deeds, in the county where the property shall then be situated," &c. One Patterson executed mortgages of personal property, and among them one or more (March 2, 1880) to Cameron, Hull & Co., who failed to record them. Afterwards Patterson contracted a debt to Goodnow & Co. On June 3, 1880, Cameron, Hull & Co. took possession of the property under their mortgages which had not been recorded. On June 11, eight days after, the subsequent creditors commenced action by attachment, and under this process the sheriff seized the property. The holders of the unrecorded mortgages, Cameron, Hull & Co., brought an action of replevin against the sheriff, and the question was, whether they, as mortgagees, or "the subsequent creditors," Goodnow & Co., were entitled to the property; and it was held that the mortgages, from the time the mortgagees took possession, must be considered as valid, and the plaintiffs had a verdict.

In delivering the judgment of the court, Judge Valentine said: "We will assume that the mortgages were void as against Goodnow & Co. and all the subsequent creditors up to the time when

the plaintiffs took possession of the property, and will simply discuss the question whether they continued to be void after that time. Did the mortgages become valid when the plaintiffs took possession of the property under them? We think we must answer this question in the affirmative. [Citing many authorities.] Mr. Jones, in his work on chattel mortgages, says that if a mortgagee takes possession of the property before any other right or lien attaches, his title under the mortgage is good against everybody, although it be not acknowledged and recorded. Counsel for the defendant in error seem to contend that when a chattel mortgage is not recorded immediately after its execution, and the property is not immediately delivered, it is absolutely void as to all creditors whose debts have been created subsequent to the execution of the mortgage and prior to its being recorded. * * *

"Of course a chattel mortgage not recorded of personal property not delivered is void as to all creditors who have no notice of the mortgage; but they have no right to, nor interest in, any specific property until they have obtained this right or interest by some legal process. They have no more right to the property than the mortgagee has, whose mortgage is void. They all have an equal right to the property—that is, they all have a right to procure a lien upon it, and the one who first acts will obtain the prior right. The mortgagor has a continuing right to mortgage his property. He has the right to prefer one creditor over another. And if the mortgagee, whose mortgage is not recorded, and who does not have possession of the property, records his mortgage with the consent of the mortgagor, &c., his mortgage then has the force and effect of a mortgage executed on the day on which it is filed for record, or on which the property is delivered. It is the same thing as though a new mortgage had been executed by the parties and recorded. The old mortgage is then given life and force and effect by the joint action of both parties, and hence must be held to be valid from that time on as against all persons," &c. Our act recognizes registry, not only within the time, but afterwards. It is the right of the mortgagee to record, which he may or may not exercise in or out of time with or without the consent of the mortgagor.

If, as Mr. Dwarris states, considerations of inconvenience are allowable in construing a doubtful statute, it seems to us that the construction contended for, giving to a particular class of general creditors an anomalous character, yielding to some liens and overriding others—would in practice be fruitful of untold "complications, inconveniences, hardships, and embarrassments," creating indeed in this case what the learned master so aptly styled "a curious puzzle." Under what we conceive to be the proper construction of the act, no such complication can arise. The Doar mortgage, although recorded out of time, from that date became valid as a lien, and as such had priority over all the general debts of the mortgagor which had not then become liens, regardless of the time they were contracted as prior or subsequent; and as to the mortgage of Fraser, who had actual notice, it (the Doar mortgage) was, according to its date, the first lien, and from the proceeds of the mortgaged premises must be first paid, and the mortgage of Fraser second.

It is the judgment of this court that the judgment of the Circuit Court be modified so as to conform to the conclusions herein announced, and in all other respects be affirmed.

MR. CHIEF JUSTICE SIMPSON concurred.


MR. JUSTICE McIVER, *dissenting.* I am unable to concur in the construction given to the act of 1876, and, on the contrary, agree with the view taken by the master and adopted by the Circuit Judge. The question is so fully and satisfactorily discussed by master Hanckel in his able and elaborate report that it would be a work of supererogation to go at large into the argument. I propose simply to indicate some of the points which, to my mind, are conclusive.

The language of the statute to be construed, so far as it relates to the particular question with which we are concerned, is as follows: "All mortgages, or instruments in writing in the nature of a mortgage, of any property, real or personal, * * * shall be valid so as to affect, from the time of such delivery or execution, the rights of subsequent creditors or purchasers for valuable consideration without notice, only when recorded within

forty days from the time of such delivery or execution.   *   *   *
*Provided*, nevertheless, that the above mentioned deeds, or
instruments in writing, if recorded subsequent to the expiration
of said period of forty days, shall be valid to affect the rights of
subsequent creditors and purchasers for valuable consideration
without notice only from the date of such record." The ques-
tion to be determined is, whether the Doar mortgage, which was
not recorded within forty days from its execution, takes prece-
dence of the general creditors whose claims were incurred
between the time of the execution of that mortgage and the time
when it was recorded.

The turning point of the inquiry, as it seems to me, is whether
the words "subsequent creditors and purchasers" in the proviso
to the act mean persons whose claims arose subsequent to the *date*
of the mortgage, whose validity is in question, or subsequent to
the *record* of such mortgage. I think they refer to the latter, and
and not to the former period. There can be no doubt, and I under-
stand it to be conceded, that if the body of the act stood alone,
without the proviso, the result would be that a mortgage not
recorded until after the time allowed for that purpose would have
no validity as against the claims of creditors or purchasers sub-
sequent to the date of such mortgage; for the language of the
act of 1876, that a mortgage shall be valid so as to affect the
rights of subsequent creditors and purchasers without notice,
only when recorded within forty days, is in effect the same as
that used in the act of 1843, which substantially declared that no
mortgage should be valid so as to affect the rights of subsequent
creditors and purchasers without notice, unless it shall be recorded
within sixty days. To say that a mortgage shall be valid only
when recorded, is tantamount to saying that no mortgage shall be
valid unless it is recorded, &c.

The language of the act of 1843 has been construed by the
courts of this State in several cases to mean that a mortgage not
recorded within time has no validity as against subsequent cred-
itors or purchasers without notice, and this, therefore, would be
the proper construction of the act of 1876, without the proviso.
*McKnight* v. *Gordon*, 13 *Rich. Eq.*, 222; *Williams* v. *Beard*,
1 *S. C.*, 309; and *Piester* v. *Piester*, 22 *S. C.*, 139. The

inquiry, then, is as to the effect of the proviso. Was its purpose anything more than to relieve a mortgagee who had neglected to record his mortgage within time from the extreme penalty, which under the body of the act he would incur, of having his mortgage declared of no validity as against the claims, not only of creditors or purchasers subsequent to the execution of the mortgage, but also of those subsequent to the recording of such mortgage, by declaring that as to this latter class his mortgage should have validity from the time it was actually recorded, inasmuch as from that time forward the public would have notice of his lien, and therefore any one who dealt with the mortgagor subsequent to that time must be affected by such lien ?

The object of the proviso was simply to qualify the very general terms used in the body of the act and to confine the protection afforded by them to the class of creditors and purchasers who needed and deserved protection, *viz.*, those who had dealt with the mortgagor without knowing, or having the means of knowing, of the mortgage, and to deprive another class of creditors and purchasers of that protection to which they would not be entitled, though under the general terms of the act, unqualified by the proviso, they could claim it, *viz.*, those who dealt with the mortgagor after they had the means of knowing of the existence of the lien by the recording of the mortgage, and who chose subsequently to that time to deal with the mortgagor.

This, it seems to me, is the proper construction of the act. The other view would lead to the very singular result of giving superior efficacy to constructive over actual notice, and this certainly was not the intention of the act. For if the Doar mortgage had never been recorded, and the simple contract creditors had received actual notice of it after their claims were contracted, this would not give the mortgage any validity as against such claims, and yet it is contended that mere constructive notice, arising from the record of the mortgage after the claims of the simple contract creditors were contracted, and after the time allowed by law for recording the mortgage, will give the mortgage a validity against these claims, which actual notice would not do.

Again, the construction contended for involves the necessity

of interpolating words into the statute, for which I find no warrant ; for, practically, by that construction the word "creditors" must be read "judgment or other lien creditors." The act, in express terms, declares that creditors, not judgment or lien creditors, subsequent to the execution of a mortgage, shall not be affected by it, unless it is recorded within forty days ; and yet it is contended, practically, that a creditor who has acquired no lien prior to the recording of a mortgage, will be affected by such a mortgage, even though it be not recorded until after the lapse of forty days. This, it seems to me, is extending protection to that class of creditors who do not need it—lien creditors—and withholding it from that class—unsecured creditors—who do need it, and defeats the main object of the registry law, which is notice—not notice to the creditor after, but before, his debt is contracted.

Again, it will be observed that the word "subsequent" qualifies the word "purchasers" as well as the word "creditors," and therefore we may legitimately test the construction by reading the act as if purchasers were the only class intended to be protected. So reading the act it seems clear that the words "subsequent creditors and purchasers" in the proviso mean persons whose claims arose subsequent to the recording, and not the date, of the mortgage. For it must be, and is, conceded that a mortgage recorded out of time cannot affect the rights of a purchaser who has bought the property subsequent to the date, but prior to the recording, of such mortgage, and as the same protection is extended in the same language to a creditor, it is difficult to understand why a creditor, whose debt was contracted subsequent to the date, but prior to the recording, of the mortgage, should not receive the same protection against the mortgage, as it is admitted a purchaser could claim.

It is a mistake to suppose that if the word "subsequent" in the proviso has relation to the time of recording of the mortgage, and not to its date, that then there would have been no necessity for the provision contained in the proviso. Such a view proceeds upon the erroneous assumption that the recording of a mortgage after the time limited for that purpose, would operate as constructive notice, and therefore that all persons who became cred-

itors or purchasers after that time, having constructive notice of the mortgage, would be bound by it. But prior to the act of 1876 the recording of a mortgage out of time did not operate even as constructive notice, and hence, according to my view, the principal object of the proviso was to enable it so to operate; and therefore the legislature very properly declared that such a mortgage should be valid as against subsequent creditors and purchasers without notice "only from the date of such record," meaning that from that time it should operate as notice to all who might subsequently thereto become creditors of, or purchasers from, the mortgagor. Otherwise the anomaly would be presented of having a creditor or purchaser affected by notice after the debt was contracted or the purchase made, when it would be difficult to understand what good the notice would do.

It seems to me, therefore, that the judgment of the Circuit Court should be affirmed.

Judgment modified.

In this case a petition for rehearing was filed by the unsecured creditors upon the ground that their counsel were absent at the hearing, because they had not expected the case to be reached as soon as it was; that they then applied for the appointment of a time when they might be heard orally, which the court declined, but gave them leave to file printed arguments.

December 2, 1885. The following order was passed—

PER CURIAM. It is not claimed that any material fact or principle was overlooked by this court in rendering its recent judgment in this case, the only ground stated in the petition for rehearing being that the petitioners had no opportunity for oral argument when the appeal was heard. It will be observed from the correspondence submitted with the petition that the court did not decline to hear oral argument in the case, but declined to fix a time for such hearing out of order, of which the petitioner had notice. The failure to hear oral argument, therefore, was not the fault of the court. Hence there is no ground for a rehearing. The petition is dismissed.